UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| MILLENIUM DRILLING CO., INC., <br><br>　　　　　　　Plaintiff, <br><br>　　v. <br><br>BEVERLY HOUSE-MEYERS RECOVABLE TRUST, et al., <br><br>　　　　　　　Defendants. | Case No. 2:12-cv-00462-MMD-CWH <br><br>ORDER |

**I.　SUMMARY**

Before the Court is Plaintiff Millennium Drilling, Inc.'s ("Millennium") Motion for Partial Summary Judgment. (Dkt. no. 136.) Defendants filed an opposition and Plaintiff filed a reply. (Dkt. nos. 149 & 153.) Defendants also moved for leave to file supplemental authorities, to which Plaintiff responded. (Dkt. nos. 155 & 159.) For the reasons discussed below, Plaintiff's Motion is denied and Defendants' motion to file supplemental authorities is also denied.

**II.　BACKGROUND**

This action arises from Defendants' investments in certain partnerships that were engaging in oil and gas exploration. Defendants Beverly House-Meyers Revocable Trust ("BHMT") and Hamrick Trust ("HT") acquired general partnership units in Falcon Drilling Partners ("Falcon"), Colt Drilling Partners ("Colt"), and Lion Drilling Partners ("Lion") (collectively, the "Partnerships"). (Dkt. no. 136 at 3.) Through their managing partner, Montcalm, LLC, the Partnerships acquired interests in portions of portfolios of oil and gas leases and lands from Third-Party Defendant Patriot Exploration Company, LLC ("Patriot"). (Dkt. no. 30 at 3.)

As part of their investment in the Partnerships, Defendants made varying amounts of cash contributions and executed the following substantially similar agreements: (1) subscription agreements ("Subscription Agreements"); (2) partnership agreements ("Partnership Agreements"); (3) subscription notes and security and pledge agreements ("Subscription Notes"); and (4) assumption agreements ("Assumption Agreements"). (Dkt. no. 136 at 3-7.) Additionally, for each Partnership, Defendants received similar private placement memoranda ("PPM"). (*Id.* at 4.) The PPMs stated that the Partnerships would enter into drilling contracts with Plaintiff to drill specified oil and gas wells. (*Id.*)

As compensation, the Partnerships agreed to make cash payments and to pledge all of their partners' Subscription Notes to Plaintiff as security for the Partnerships' future payment obligations under a turnkey note. (*Id.* at 7; dkt. no. 30 at 4.) The Subscription Notes included language allowing the Partnerships to assign the Subscription Notes to Millennium. (Dkt. no. 136 at 7.) For example, BHMT entered into a Subscription Agreement dated June 15, 2004, to acquire partnership interest in Colt by paying $1,000,000.00 in cash and by signing a Subscription Note in the principal amount of $1,200,000.00. (*Id.* at 5; dkt. no. 136-1 & 136-18.) BHMT signed an Assumption Agreement agreeing to assume its pro rata share of Colt's debt to Plaintiff. (Dkt. no. 136 at 7; dkt. no. 136-18.) Colt assigned the Subscription Note to Plaintiff. (Dkt. no. 136 at 7.)

Plaintiff's First Amended Complaint ("FAC") alleges ten causes of action. The first, fifth, and eighth claims are for breach of contract in connection with Falcon, Colt, and Lion, respectively.[1] (Dkt. no. 30.) As their third affirmative defense, Defendants assert that Plaintiff committed fraud with respect to the contracts at issue. (Dkt. no. 97 at 18.) Defendants also assert claims against certain Third-Party Defendants, including Patriot and Jonathon Feldman ("Feldman"), for fraud/fraud in the inducement and fraudulent

///

---

[1] The second claim for relief seeks to impose liability on Defendant Grace Mae Properties, LLC ("Grace Mae") based on an alter ego theory. (Dkt. no. 30 at 6.) Plaintiff also alleges that BHMT assigned its interest in Falcon to Grace Mae. (Dkt. no. 30 at 5.)

nondisclosure, among other claims.[2] (2:13-cv-78-MMD-CWH, dkt. no. 1-1.) Defendants allege that Patriot, Feldman, and other Third-Party Defendants are promoters of the oil and gas investments at issue and that they created and operated Millennium to perpetuate their fraud against Plaintiff. (*Id.*)

Plaintiff contends that Defendants have defaulted by disavowing their unconditional promise to pay Plaintiff under the Subscription Notes and Assumption Agreements. (*Id.* at 10.) Plaintiff seeks summary judgment on its three breach of contract claims (counts I, V, and VIII).

## III.   LEGAL STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). "The amount of evidence necessary

---

[2] Defendants sued Patriot and others in Texas state court. Patriot removed the case to the Southern District of Texas and then moved to transfer venue to this Court. On May 6, 2013, this Court consolidated the two related cases into the first-filed Nevada action. (Dkt. no. 79.) The plaintiffs in 2:13-cv-00078-MMD-CWH were designated as Third-Party Plaintiffs in this case and the defendants in 2:13-cv-00078-MMD-CWH were designated as Third-Party Defendants. (*Id.*) The Court dismissed Third-Party Defendants Montcalm Co., LLC (the managing partner for the Partnerships), Matthew Barnes (Montcalm's managing partner), and Schain Leifer Guralnick (the accounting firm that prepared audit returns on the investments) for lack of personal jurisdiction. (Dkt. no. 172.) Third-Party Defendants Robert and Elizabeth Holt acted as Defendants' financial advisors and allegedly informed Defendants about the investment opportunity in the Partnerships. (2:13-cv-00078-MMD-CWH, dkt. no. 1-1 at 9-10.) Third-party claims against the Holts were dismissed pursuant to the parties' stipulation. (Dkt. no. 170.)

to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

Plaintiff makes the straightforward argument that Defendants entered into the Subscription Notes and Assumption Agreements and then subsequently breached these agreements. In response, however, Defendants challenge the enforceability of these agreements based on their affirmative defense of fraud and affirmative claim of fraud in

///

the inducement.[3] Accordingly, the threshold issue is whether Defendants have demonstrated material issues of fact with respect to their fraud claim. The Court resolves this threshold issue in favor of Defendants.[4]

The parties do not dispute that agreements induced by fraud are not enforceable. *See Awada v. Shuffle Master, Inc.*, 173 P.3d 707, 713 (Nev. 2007) ("A party to a contract may seek a rescission of that contract based on fraud in the inducement."). Because of Defendants' third-party claim of fraud in the inducement, resolving Plaintiff's breach of contract claims would necessarily require the Court to determine the merits of Defendants' fraud claim, which neither side has directly presented on summary judgment. Summary judgment should be denied on this basis alone — other than the circuitous route of opposing summary judgment on Plaintiff's breach of contract claims, Defendants have not had any opportunity to present their claim or oppose its dismissal. The Court cannot dismiss Defendants' fraud claim by default without giving them such an opportunity. Even setting aside this procedural defect, the Court finds that Defendants have met their burden in opposing summary judgment.[5]

Viewing the facts and drawing all reasonable inferences in the light most favorable to the Defendants as the non-moving parties, the Court finds that Defendants have demonstrated that genuine issues of material fact exist as to whether they were induced to invest in the Partnerships by false representations of the Partnerships'

---

[3] Defendants cite to their third-party fraud claims against the "sponsors and promoters" of the Partnerships. (Dkt. no. 149 at 3.) After Defendants' brief was filed, the Court dismissed the third-party claims against three of those defendants for lack of personal jurisdiction. (Dkt. no. 172.) The Court's dismissal order does not affect Defendants' claim that they were induced to invest in the Partnerships by fraud. Moreover, claims against Patriot and Feldman have not been dismissed.

[4] The Court need not resolve any conflict-of-law issue because the Court is not examining the terms of the various agreements and whether the choice-of-law provision in these agreements should be applied here.

[5] Plaintiff contends that Defendants fail to offer any evidence or citation to the record in support of their claimed "statement of undisputed facts" (dkt. no. 149 at 4-6) in violation of LR 56-1. (Dkt. no. 153 at 2-3.) Plaintiff is correct. The Court will disregard the allegations under the claimed "statement of undisputed facts" in Defendants' response brief.

promoters, rendering unenforceable any agreements they entered into with respect to the Partnerships. Molly Hamrick, a co-trustee of HT, testified that statements she believes to be misrepresentations about the investments include, among other misrepresentations, the assurance that "there was a safety net with these bonds and income to offset promissory note" and that she "would never have to make a capital call or put money into a partnership once [she] made [her] initial investment." (Dkt. no. 149-1 at 5-6.) Beverly House-Myers, the trustee for BHMT, testified that she did not believe she would have to repay the Subscription Note because they were told that "there was zero risk in having to pay the notes; that the oil production of which they had such great experience and success for the many past years that those notes would be taken care of by the revenue coming off of the wells, and that the zero coupon bond would be purchased to pay any principal that had not been paid from the revenue that came off of the wells." (Dkt. no. 149-2 at 6-7.) Ms. House-Myers further testified that the Subscription Note was a "big issue" and about "[t]he fact that [she] would not have to ever repay the note because it was paid, the interest and principal were . . . paid back with the first revenues that came off the wells." (*Id.* at 9.) These testimonies create genuine issues of material fact as to the alleged false representations made to induce Defendants to invest in the Partnerships, leading to the execution of the agreements that Plaintiff now seeks to enforce.

In response, Plaintiff first argues that the undisputed evidence shows that Third-Party Defendant Feldman did not make any fraudulent statements to Ms. Hamrick. (Dkt. no. 153 at 7-9.) Plaintiff argues that because Ms. Hamrick was uncertain whether she met with Feldman,[6] and because Feldman was unequivocal that he did not meet or talk to her, it is undisputed that Feldman did not make any false representations to Ms. Hamrick. However, drawing all reasonable inferences in the light most favorable to the

---

[6]Plaintiff offers excerpts of Ms. Hamrick's testimony where she indicated she thought she met with Feldman. (Dkt. no. 152 at 8.)

non-moving parties, Ms. Hamrick's testimony creates a material issue of fact as to whether she met with Feldman.

Plaintiff next argues that because Defendants "completely relied" on Robert and Elizabeth Holt,[7] they did not rely on any representations from Feldman. (*Id.* at 12-13.) It is not clear to the Court that Defendants' fraud claim hinges on whether the representations were made by Feldman or by the Holts. Defendants allege that the Holts were involved in making false statements about the investments. (2:13-cv-00078-MMD-CWH, dkt. no. 1-1 at 23-24.) Nevertheless, the Court need not resolve this issue at this stage because Defendants have offered sufficient evidence to show that Ms. Hamrick and Ms. House-Myers had discussions with Feldman. As noted above, Ms. Hamrick testified she thought she met Feldman, and Ms. House-Myers testified that the discussions about the investment involved "primarily" Feldman. (Dkt. no. 149-2 at 10:5.)

Finally, Plaintiff argues that because Defendants' fraud claim and the facts supporting it are directly contrary to the express terms of the agreements at issue, Defendants are legally foreclosed from asserting fraud. As support, Plaintiff offers the Nevada Supreme Court decision of *Road & Highway Builders, LLC v. Northern Nevada Rebar, Inc.*, 284 P.3d 377 (Nev. 2012), where the court found that the fraud in the inducement claim failed as a matter of law because it contradicted the express terms of the parties' integrated contract.[8] In that case, Road and Highway Builders ("Builders") contracted with Northern Nevada Rebar ("NNR") entered into an agreement for NNR to provide labor and materials for reinforcing steel, or rebar, including an amount to be used for installing reinforced concrete boxes ("RCBs") for a Nevada Department of

---

[7]Plaintiff also relies on the Holts' testimony that Feldman did not make any false representation. Their testimony may support Feldman's affidavit, but does nothing to resolve the disputed material issues of fact presented here.

[8]Plaintiff also cites to *Tallman v. First National Bank of Nevada*, 208 P.2d 302 (Nev. 1949), but that case involves the admission of extrinsic evidence to contradict the terms of a written agreement where fraud was not properly pleaded or established. In fact, the Nevada Supreme Court recently reaffirmed that extrinsic or oral evidence is admissible to show fraud in the inducement. *Khan v. Bakhsh*, 306 P.3d 411, 413 (Nev. 2013).

1  Transportation ("NDOT") project. NNR claimed that its bid, including the unit price, was
2  based on the assumption that it would be providing all of the rebar for the project. (*Id.* at
3  378.) The contract provided for Builders to change the scope of work unilaterally (i.e.,
4  order additions, deletions, or revisions) and to have the absolute right to terminate the
5  contract. (*Id.* at 379.) The contract also established the unit price for the rebar and
6  provided that the unit price would remain the same regardless of quantity, although the
7  contract did specify that the final quantities must match NDOT's quantities unless the
8  parties otherwise agreed in writing. (*Id.* at 379, 381.) Builders did not disclose that it had
9  obtained approval from NDOT to use precast RCBs from another supplier and that it
10 planned to reduce the quantity of rebar furnished by NNR. (*Id.* at 379.) After NNR
11 learned of Builders' use of precast RCBs from the other supplier, it sought an equitable
12 adjustment of the unit price for the rebar. (*Id.*)

13 A dispute ultimately arose, leading to Builders' claim for breach of contract and
14 NNR's counterclaim for fraud in the inducement. NNR claimed that by failing to disclose
15 that it had no intention of performing its contractual obligations, Builders induced NNR to
16 enter into the contract and to offer a lower unit price because of the large quantity of
17 rebar needed for the construction project. (*Id.* at 380.) The Nevada Supreme Court found
18 that the fraud claim directly contradicted the express terms of the contract because the
19 contract provided for Builders to unilaterally make changes without affecting the unit
20 price. (*Id.* at 381.) While Builders failed to obtain a written agreement before changing
21 the quantity of the rebar, the court found that such failure amounted to a breach of
22 contract, not fraud. (*Id.*)

23 Defendants analogize the facts presented in this case to the dispute in *Road &*
24 *Highway Builders*. They rely on the following boiler plate provision in the Subscription
25 Agreements:

26 > (d) The undersigned confirms that . . . he has received no representations, warranties or written communications with respect to the offering of Units other than those contained in the Partnership Documents, and that in entering into this transaction the undersigned is not relying upon

8

    any information other than that contained in the Partnership Documents and the results of his own independent investigation."

(Dkt. no. 136-1 at 5.) Plaintiff argues that the cited provision prevents Defendants from "asserting reliance upon alleged oral representations which are not contained in, and are not in contradiction of, the written documents." (Dkt. no. 153 at 15.)

  However, unlike in *Road & Highway Builders*, Plaintiff has not demonstrated that the allegations supporting the fraud claim are directly contradictory to the cited provision in the Subscription Agreement. For example, Plaintiff has not shown that Ms. House-Myers' testimony that she was told revenue from the oil wells would be used to pay off the Subscription Note contradicts the terms of the Subscription Note or any of the other agreements. At best, the cited provision in the Subscription Agreement supports Plaintiff's argument to the trier of fact that Defendants should not have relied on any oral representations of Feldman or anyone else in making their decision to invest in the Partnerships. Based on the evidence presented, the Court cannot decide as a matter of law that the allegations supporting the fraud claim contradict the express terms of the agreements at issue.

## V. CONCLUSION

  The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

  It is therefore ordered that Plaintiff's Motion for Partial Summary Judgment (dkt. no. 136) is denied.

  It is further ordered that Defendants' motion for leave to file supplemental authorities (dkt. no. 155) is also denied.

  DATED THIS 26th day of September 2014.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE